IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PENNY NEWMAN GRAIN COMPANY, ) | No. CV-F-06-1020 OWW/DLB |
| ) | |
| ) | ORDER DENYING DEFENDANT THE |
| ) | GLIDDEN COMPANY DBA ICI |
| Plaintiff, ) | PAINT'S MOTION TO DISMISS |
| ) | FOURTH CAUSE OF ACTION OF |
| vs. ) | FIRST AMENDED COMPLAINT |
| ) | (Doc. 11) |
| ) | |
| MIDWEST PAINT SERVICES, INC., ) | |
| et al., ) | |
| ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____) | |

Plaintiff Penny Newman Grain Co., Inc. (Penny Newman) has
filed a First Amended Complaint for Breach of Contract,
Negligence and Breach of Express Warranty (FAC). Named as
defendants are Midwest Paint Service, Inc. (Midwest), ICI Paints
(ICI), and Does 1-100. The FAC alleges that Penny Newman and
Midwest entered into a Painting Contract in June 2003 under which
Midwest agreed to provide the labor, supplies, insurance,
equipment and tools necessary to prepare, patch and paint a
storage facility consisting of concrete silos in Stockton,

1

California (the Stockton Facility) for the sum of $336,500; that Midwest began the process of preparing and repainting the Stockton Facility in August 2003; that Midwest finished working on the Stockton Facility in January 2004.  The FAC further alleges:

> 10.  MIDWEST has at all times failed, refused and neglected to perform according to the terms of the Painting Contract, including the specifications and provisions therein.  More specifically, MIDWEST negligently prepared the surface of the Stockton Facility, painted the Stockton Facility and/or selected a paint wholly unsuitable for the purposes for which it was used and which MIDWEST knew or should have known was unsuitable for said application.  As a result of the foregoing conduct of MIDWEST, large sections of the paint applied to the Stockton Facility failed to adhere to its surface, resulting in blistering, flaking and in many instances, the complete stripping of paint from the surface of the Stockton Facility, exposing it to the elements.

The Fourth Cause of Action is for negligence against defendant ICI Paints and Does 51-100.  The Fourth Cause of Action alleges in pertinent part:

> 27.  PENNY NEWMAN is informed and believes that, prior to undertaking the painting of the Stockton Facility, MIDWEST consulted with a representative or representatives of ICI PAINTS regarding its intent to use Devoe Hydrosealer and High Build Acrylic Enamel in the course of that project.  PENNY NEWMAN is further informed and believes, and thereupon alleges that a representative or representatives of ICI PAINTS specifically advised MIDWEST that the foregoing Devoe products were not suitable for the application which MIDWEST intended to use them for, e.g. the painting of the Stockton Facility.

28.   Despite ICI PAINTS specific knowledge of MIDWEST's intention to use the foregoing Devoe products in the repainting of the Stockton Facility, and the fact that the Devoe products were not suitable for such an application, ICI PAINTS nevertheless sold the foregoing Devoe products to MIDWEST for use in the repainting of the Stockton Facility, failed to provide any notice to PENNY NEWMAN of the inappropriateness of the Devoe products being used by MIDWEST, and failed to take any other precaution in order to protect PENNY NEWMAN from the foreseeable damages resulting from the inappropriate Devoe sealer and paint in the painting of its Stockton Facility.

29.   By virtue of ICI PAINTS' having manufactured the above-referenced Devoe products, having been advised by MIDWEST of the intended use for such products, and selling the foregoing Devoe sealer and paint products to MIDWEST with knowledge of their intended use in the repainting of PENNY NEWMAN'S Stockton Facility, ICI Paints owed a duty of care to PENNY NEWMAN with respect to such activities.

30.   In acting as alleged hereinabove, ICI PAINTS was careless, and negligent in violation of its duties and obligations to PENNY NEWMAN, as the owner of the Stockton Facility.  As a direct and proximate result of the carelessness and the negligence of ICI PAINTS, PENNY NEWMAN has been damaged as alleged hereinabove.

The FAC prays for "the costs of hiring experts to investigate and analyze the damages in an amount according to proof at the time of trial" and "the costs of restoration and repair to the Stockton Facility according to proof at the time of trial".

Defendant The Glidden Company dba ICI Paints moves to dismiss the Fourth Cause of Action pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, for failure to state a claim

3

1    upon which relief can be granted.

2        A.  **Governing Standards**.

3        A motion to dismiss under Rule 12(b)(6) tests the

4    sufficiency of the complaint.  *Novarro v. Black*, 250 F.3d 729,

5    732 (9th Cir.2001).  Dismissal of a claim under Rule 12(b)(6) is

6    appropriate only where "it appears beyond doubt that the

7    plaintiff can prove no set of facts in support of his claim which

8    would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-

9    46 (1957).  Dismissal is warranted under Rule 12(b)(6) where the

10   complaint lacks a cognizable legal theory or where the complaint

11   presents a cognizable legal theory yet fails to plead essential

12   facts under that theory.  *Robertson v. Dean Witter Reynolds,*

13   *Inc.*, 749 F.2d 530, 534 (9th Cir.1984).  In reviewing a motion to

14   dismiss under Rule 12(b)(6), the court must assume the truth of

15   all factual allegations and must construe all inferences from

16   them in the light most favorable to the nonmoving party.

17   *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002).  However,

18   legal conclusions need not be taken as true merely because they

19   are cast in the form of factual allegations.  *Ileto v. Glock,*

20   *Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003).  Immunities and other

21   affirmative defenses may be upheld on a motion to dismiss only

22   when they are established on the face of the complaint.  *See*

23   *Morley v. Walker*, 175 F.3d 756, 759 (9th Cir.1999); *Jablon v.*

24   *Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980)  When ruling

25   on a motion to dismiss, the court may consider the facts alleged

26   in the complaint, documents attached to the complaint, documents

                                    4

relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice.  *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-706 (9th Cir.1988).

**B.   <u>Request for Judicial Notice</u>**.

In its reply brief, ICI requests that judicial notice under Rule 201, Federal Rules of Evidence, be taken of the Third Party Complaint of Midwest Paint Service, Inc. Against Norberg Paints, Inc. filed in this action. (Doc. 15)  In the Third Party Complaint, Midwest alleges that Norberg Paints, Inc., an authorized retailer of Devoe paint products, misrepresented to Midwest that the Devoe paint products were appropriate for the Stockton Facility, and alleges causes of action for negligent misrepresentation and indemnity/contribution.

Judicial notice may be taken of a pleading filed in an action as a matter of public record.  *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir.2001).  However, because a court may not take judicial notice of a fact that is "subject to reasonable dispute", Rule 201(b), Federal Rules of Evidence, judicial notice will be limited to the fact of the allegations in the Third Party Complaint and will not be considered for the truth of those allegations in resolving this motion to dismiss.  *Lee, id.* at 689-690.

**C.   <u>Legal Duty/Duty to Warn</u>**.

ICI argues that dismissal is appropriate because the FAC does not articulate any legal duty ICI supposedly owed to Penny

5

Newman.  ICI contends the allegations that ICI "owed a duty of care" and was "careless and negligent in violation of its duties and obligations" to Penny Newman do not suffice because they fail to identify any basis for a legal duty upon which Penny Newman purports to sue ICI.

"'Whether a duty of care exists is a question of law for the court ... The existence of a duty 'must be decided by the court on a case-by-case basis.'" *Briano v. Conseco Life Ins. Co.*, 126 F.Supp.2d 1293, 1297 (C.D.Cal.2000).  "Whether a duty will be imposed depends upon a number of factors, including: (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of the injury suffered, (3) the degree of certainty the plaintiff was injured, (4) the connection between the defendant's conduct and the injury, (5) the moral blame attached to the conduct, and (6) the policy of preventing future harm." *Lincoln Alameda Creek v. Cooper Industries, Inc.*, 829 F.Supp. 325, 328 (N.D.Cal.1992), *citing Biakanja v. Irving*, 49 Cal.2d 647, 650 (1958).  In *Ileto v. Glock, Inc.*, 349 F.3d 1191 (9th Cir.2003), *rehearing en banc denied*, 370 F.3d 860 (9th Cir.2004), *cert. denied sub nom. China North Industries Corp. v. Ileto, 543 U.S. 1050 (2005),* the Ninth Circuit explained:

> Whether a legal duty arises 'is a question of law which is simply an expression of the sum total of the policy considerations that lead a court to conclude that a particular plaintiff is entitled to protection.' ... A critical part of the determination of whether a particular plaintiff is entitled to protection is whether she is 'foreseeably endangered by defendant's conduct.' ... The

1          California Supreme Court has explained that
           the legal duty to exercise due care so as not
2          to create an 'unreasonable risk of injury to
           others' extends to the 'class of persons who
3          it is reasonably foreseeable may be injured
           as the result of the actor's conduct[.]' ...
4          The court continued, '[i]t is well
           established, moreover, that one's general
5          duty to exercise due care includes the duty
           not to place another person in a situation in
6          which the other person is exposed to an
           unreasonable risk of harm through the
7          reasonably foreseeable conduct (including the
           reasonably foreseeable negligent conduct) of
8          a third person.'

9          Penny Newman notes the allegations in the FAC that Midwest

10    consulted with representatives of ICI regarding the use of the

11    Devoe products to paint the Stockton Facility and that ICI knew

12    prior to the painting of the Stockton Facility that the use of

13    the Devoe products was inappropriate for that specific

14    application and so advised Midwest.  Despite ICI's alleged

15    knowledge of both the specific project to be painted and the

16    unsuitability of the Devoe products for that job, ICI proceeded

17    to sell those products to Midwest, without taking any precaution

18    to prevent Penny Newman from being harmed.  Penny Newman asserts

19    that the factors upon which California law bases the existence of

20    a duty of care are clearly present in the allegations of the FAC:

21          The transaction between MIDWEST and [ICI],
           the sale of paint products despite an
22          improper application, was clearly intended to
           effect PENNY NEWMAN as an owner of the
23          facility to be painted.  Moreover, the
           transaction between MIDWEST and [ICI] did not
24          take place in the abstract. [ICI] was fully
           aware of MIDWEST's intent to use
25          inappropriate paint products in conjunction
           of the painting of the Stockton Facility.  In
26          short, [ICI] knew both the specific project

                                   7

1          in which the paint products were to be
           utilized and the owner of that project at the
2          time of their sale to MIDWEST.

3          ... Despite having advised MIDWEST of the
           fact that the paint products MIDWEST proposed
4          to use in painting the Stockton facility
           [sic] was wrong for such an application,
5          [ICI] sold that same paint to MIDWEST without
           apparent hesitation.  As a result, injury to
6          PENNY NEWMAN was ... foreseeable ....

7          That PENNY NEWMAN has been injured [because]
           under the allegations of the [FAC], it has
8          spent well in excess of $300,000 repainting
           its Stockton Facility with paint which should
9          never have been used for that application.
           In addition, PENNY NEWMAN is faced with the
10         process of stripping the improperly utilized
           paint products sold by [ICI] to the extent
11         that the paint has not already fallen off,
           and incurring additional expense to repeat
12         the entire painting process.  That injury ...
           would not have taken place had [ICI] taken
13         either of two courses of action, neither of
           which would have significantly burdened it.
14         [ICI] could have either refrained from
           selling paint products which it knew were
15         going to be improperly utilized.
           Alternatively, since it was aware that the
16         project at issue was the painting of [the]
           Stockton Facility, it could have contacted
17         PENNY NEWMAN and advised them that they did
           not approve the use of Devoe Hydrosealer and
18         Hi-Build Acrylic Enamel for the repainting of
           the Stockton Facility.
19
           The conduct of [ICI] as alleged in the [FAC]
20         is unquestionably blameworthy. [ICI] knew of
           MIDWEST's intention to proceed to use their
21         paint products improperly, facilitated the
           improper use of those products, reaped the
22         profit from the sale of its paint products
           and then apparently sat idly by while its
23         paint products were applied to the Stockton
           Facility and, inevitably, failed.
24
     Finally, Penny Newman argues, imposition of a duty of care in
25
     this case will further the policy of preventing future harm:
26

                                    8

The case before this Court involves a seller
with specific knowledge of the
inappropriateness of its product for a
planned application, the buyer of the
product's intention to use that product in an
inappropriate manner, and the identity of the
entity that would be harmed by the third
party's misconduct.  Under those
circumstances, a product manufacturer should
be deterred from selling a product for an
application as to which the product is
unsuitable.

ICI further argues that it did not owe a duty to warn Penny

Newman.  In so arguing, ICI relies on *Persons v. Salomon North*

*America, Inc.*, 217 Cal.App.3d 168 (1990).

*Persons* involved an action by a skier against the

manufacturer of rented ski bindings that were incompatible with

the thermoplastic ski boots plaintiff owned, causing her injury

when she fell.  The trial court denied plaintiff's motion for a

partial directed verdict on the issue of the manufacturer's duty

to warn the plaintiff.  The Court of Appeal affirmed and noted

"in failure to warn cases where the product is both flawlessly

designed and manufactured, the defect is not inherent in the

product; rather, the product is rendered defective because of the

actions of the manufacturer in failing to adequately warn of the

dangerous condition."  217 Cal.App.3d at 174-175.  The Court of

Appeal explained in pertinent part:

[C]ourts have recognized that the test for
failure to warn under strict liability
contains a standard of reasonableness ...
Factors such as 'the normal expectations of
the consumer as to how the product will
perform, degrees of simplicity or
complication in the operation or use of the
product, the nature and magnitude of the

9

danger to which the user is exposed, the likelihood of injury, and the *feasibility and beneficial effect of including a warning*' must be considered to determine whether a warning is necessary ....

Another circumstance which should be considered is the reliability of a third party, e.g., a business intermediary, to convey the warning to the ultimate user. This factor is contained in comment n to section 388 of the Restatement Second of Torts.  Although comment n relates to a product liability cause of action for negligent failure to warn where the manufacturer alerted only the intermediate distributors, we conclude that its factors make it clear that the touchstone of liability under a strict liability cause of action for failure to warn is *reasonableness* and relied on concepts common to those found in negligence ....

217 Cal.App.3d at 175.  The Court of Appeal concluded:

[T]he evidence in this case sufficiently established that a direct warning to plaintiff would have been ineffective, and thus unnecessary, because of the ultimate user's lack of ability to make an informed judgment from such notice and the fact that the skier necessarily relies on the knowledge and technical expertise of the ski shop in selecting rental skis and bindings and making proper adjustments to set the bindings at an appropriate release level based on the skier's height, weight and skiing ability.

When a manufacturer or distributor has no effective way to convey a product warning to the ultimate consumer, the manufacturer should be permitted to rely on downstream suppliers to provide the warning.  'Modern life would be intolerable unless one were permitted to rely to a certain extent on others doing what they normally do, particularly if it is their duty to do so.' ....

Here, Cornice was in the business of renting skis and bindings.  It had an independent

10

duty to exercise reasonable care in supplying this equipment and was itself subject to strict liability for failure to warn its customers of the dangerous propensities of articles it rented ....

The evidence establishes that Salomon 444 bindings do not pose a danger unless used with nonstandard or untreated thermoplastic boots.  Once it has distributed its bindings to rental shops such as Cornice, Salomon has no practical way, other than warning and educating the rental shops of the danger, to control its product to see that the bindings are not used with untreated thermoplastic boots.  Moreover, issuance of an effective warning depends upon proper identification of the skier's boots.  Salomon cannot be expected to know the identity of the ultimate user of its rental bindings, much less the type of boot the consumer is using.  However, the ski shop technician has direct contact with such customer and has the ability, applying Salomon's technical manual with seminar training, to identify a customer's boot, assess its compatibility with Salomon bindings, lubricate the boot if necessary and set a safe release level.

Having provided a warning to Salomon dealers, defendant had a reasonable basis to believe Cornice would pass along the product warning and was justified in relying upon Cornice to perform its independent duty to warn as required by law ....

In sum, we find that the evidence is sufficient to establish that Salomon did not have a duty, as a matter of law, to warn plaintiff ....

217 Cal.App.3d at 177-178.

ICI argues that the facts of *Persons* are similar to those alleged in the FAC and that its reasoning applies:

Here, Plaintiff alleges without equivocation that ICI warned Midwest - an admittedly sophisticated intermediary - that its paint was unsuitable for use on the Stockton

11

Facility ... In providing this statement to
Midwest, ICI discharged its duty to warn
under California law and no additional duty
to warn Plaintiff exists.

Penny Newman responds that the Fourth Cause of Action is not

premised solely on a duty to warn:

Such a warning only became necessary because
[ICI] chose to proceed with the sale of its
paint products to MIDWEST, despite its
knowledge of the fact that MIDWEST intended
to use them on an inappropriate application.
As a result, [ICI] could have avoided
breaching its duty to PENNY NEWMAN by either
refraining from selling the product in the
first place, or in the alternative, at least
providing PENNY NEWMAN with the same warning
which it provided to MIDWEST, so that PENNY
NEWMAN could take whatever cautions it deemed
appropriate.

Penny Newman further argues that *Persons* is distinguishable

because ICI was aware that the Devoe products were to be used by

Midwest to paint Penny Newman's Stockton Facility.  Therefore,

ICI, unlike Salomon, had multiple, simple, and practical methods

by which it could have warned Penny Newman which do not involve

product labeling or packaging.  Furthermore, Penny Newman notes,

the Fourth Cause of Action is not based on strict liability for

failure to warn:

The paint products sold by [ICI] to MIDWEST
were not, per se, defective with or without a
warning.  They were simply unsuitable for the
application as to which [ICI] knew MIDWEST
intended to use its paint products.  The
purpose of notice to MIDWEST in this case
would not ameliorate any defects or any
particular qualities in [ICI's] paint
products.  Rather, notice to PENNY NEWMAN
would have prevented their usage altogether
by alerting PENNY NEWMAN to the unsuitability
of the paint being sold to MIDWEST.

12

Moreover, while Salomon may have been able to
reasonably rely on the assumption that an
installer/renter would follow the warnings
and instructions provided with its ski
bindings, [ICI], at the time that it sold the
paint products to MIDWEST, knew that MIDWEST
was disregarding its warning and proceeding
to utilize the paint products for an improper
application.

ICI replies that the two primary factors in evaluating

whether a product manufacturer owes a duty to warn the ultimate

consumer when the manufacturer has already conveyed an adequate

warning to a sophisticated intermediary compels a finding that

ICI discharged its duty to warn when it allegedly advised Midwest

that the selected paint was unsuitable for the Stockton Facility.

Looking to the likelihood that Midwest would convey that

information to Penny Newman, ICI argues:

Plaintiff alleges that it hired Midwest to
select and use 'suitable' paint for the job
... It did not hire ICI for either of these
tasks.  Nor is there any allegation that
Plaintiff ever sought ICI's advice or
guidance with regard to such paint selection.
Thus, not only is it likely that Midwest
would heed or convey ICI's alleged warning,
Midwest was contractually-obligated [sic]  to
Plaintiff to do so.  Midwest also is alleged
to be a highly-skilled [sic] painting
contractor 'who specializes in the painting
of grain elevators and mills' and, as such,
it warranted to Plaintiff its 'work will be
completed in a good and workmanship like
manner [sic].' ... ICI, thus, was entitled to
rely on Midwest to exercise its skill and
judgment and perform the job, for which it
was hired, in a competent and workmanlike
manner ....

ICI refers to *Carmichael v. Reitz*, 17 Cal.App.3d 958 (1971),

wherein a drug manufacturer did not have a duty to warn the

13

patient in part because a sophisticated intermediary, i.e., the physician, constituted an "intervening party" for purposes of conveying a manufacturer's warning to the ultimate consumer:

> The doctor is intended to be an intervening
> party in the full sense of the word.  Medical
> ethics as well as medical practice dictate
> independent judgment, unaffected by the
> manufacturer's control, on the part of the
> doctor.

17 Cal.App.3d at 988.  ICI also refers to *Stevens v. Cessna Aircraft Company*, 115 Cal.App.3d 431 (1981), holding that the aircraft manufacturer did not have a duty to warn passengers directly about an airplane's weight restrictions, concluding that "[i]n the airplane situation the passenger necessarily depends upon the skill and judgment of the pilot to determine the load capacity of the airplane in light of the flying conditions to be encountered", 115 Cal.App.3d at 434, and that "[i]t is the pilot who has control of the airplane and the responsibility under federal regulations to determine aircraft weight prior to takeoff."  *Id.* at 433.  ICI argues that the rationale of these cases applies to the allegations of the FAC:

> Midwest's contractual obligations to
> Plaintiff, combined with its alleged
> expertise in painting grain mills, makes it
> the intended 'intervening party in the full
> sense of the word.'  It is Midwest 'who has
> control' of the job and the contractual
> responsibility, commensurate with its
> professional skill, to select the suitable
> paint in light of the conditions that existed
> at Plaintiff's facility.  ICI is not a
> painting contractor; nor did Plaintiff hire
> it to paint its facility or to select
> suitable paint for the job.  When ICI
> allegedly 'advised' Midwest that its paint

14

selection was 'unsuitable' for this job, ICI
rightfully was entitled to rely on Midwest to
perform its obligations in accordance with
its alleged expertise.

With regard to the feasibility and effectiveness of warning

the consumer directly, ICI argues:

Just like the doctor in *Carmichael* and the
pilot in *Stevens*, the 'ordinary consumer' of
ICI's paint is not Plaintiff, but rather
Midwest.  Just like the doctor and the pilot,
Midwest is alleged to possess a high degree
of sophistication and experience in painting
grain elevators and mills ... The judgment
about which paint is most suitable for
Plaintiff's grain silos is thus best left to
the 'skill and judgment' of Midwest, the
specialized painting contractor who Plaintiff
hired specifically for this purpose.

In particular, the judgment about which paint
is most suitable for a certain job must be
based on many factors which typically are
unique to that job - e.g. environmental
conditions, conditions of surfaces to be
painted, etc. - and cannot be made by a
remote manufacturer.  Instead, that judgment
must be made by the on-site contractor who is
in the best position and has the expertise to
evaluate these factors.  It would impose an
unfeasible and onerous burden on a paint
manufacturer to be familiar with the numerous
conditions that may exist at each jobsite
throughout the country where its products
ultimately may be used.  Thus, like
determining appropriate loads for an airplane
or prescribing medicine for a particular
patient, evaluating the factors relevant to
selecting the appropriate paint for
Plaintiff's silos is better left to Midwest,
the skilled profession contractor who
Plaintiff hired to perform precisely that
job.

The fact that a manufacturer may know the
identity of the end-user does not operate to
create the duty Plaintiff seeks to enforce
here.  Otherwise, the manufacturer would find
itself in the untenable situation Plaintiff

15

> proposes where it must substitute its
> judgment for that of the contractor hired to
> do the job so as to avoid potential liability
> to an ultimate consumer.  Such an
> intervention would not be effective or
> desirable.  Interjecting itself into the
> contractual relationship between Plaintiff
> and Midwest ... could create potential
> liability for ICI.  If ICI had done as
> Plaintiff advocates, thereby undermining
> Midwest's recommendations and expertise,
> Midwest could take the position that ICI
> interfered with its contractual relationship
> and impugned its reputation as a specialty
> painting contractor.

ICI further argues that Penny Newman's assertion that ICI should have enforced its alleged advice to Midwest by withholding the sale of the Devoe products to Midwest is not a viable alternative.  ICI refers to *Groll v. Shell Oil Company*, 148 Cal.App.3d 444 (1983).  In *Groll,* a boy who used stove and lantern fuel to light a fireplace, resulting in personal injury, brought a products liability action against the manufacturer of the fuel.  The manufacturer sold the fuel in bulk, accompanied by a data sheet which adequately warned of the fuel's dangerous propensities.  The fuel was resold to a distributor who packaged it in individual containers and provided a warning on the container that the fuel was extremely flammable and should be kept away from heat and open flame.  The trial court granted the manufacturer's motion for nonsuit on the ground that the manufacturer did not owe or breach a duty to the plaintiff.  In affirming, the Court of Appeals cited *Carmichael v. Reitz* and *Stevens v. Cessna Aircraft Co*. as well as *Walker v. Stauffer Chemical Corp.*, 19 Cal.App.3d 669 (1971) in holding that the

16

manufacturer did not have a duty to warn the consumer directly:

> Since respondent manufactured and sold BT-67
> in bulk, its responsibility must be absolved
> at such time as it provides adequate warnings
> to the distributor who subsequently packages,
> labels and markets the product.  To hold
> otherwise, would impose an onerous burden on
> the bulk sales manufacturer to inspect the
> subsequent labeling of the packaged product.
> In addition the manufacturer would have
> severe enforcement problems if the bulk
> product purchaser failed to adhere to the
> recommended warnings.

148 Cal.App.3d at 449.  ICI argues that the same situation is

presented here:

> *First*, the [Third Party Complaint]
> demonstrates that ICI did not sell directly
> to Midwest but rather Midwest purchased the
> paint from an authorized retailer, Norberg.
> Thus, under Plaintiff's theory, ICI would
> have been required to withhold sales of its
> paint to one of its authorized retailers - a
> clearly improper and likely illegal action.
> *Second*, to recognize such an obligation would
> confer on ICI authority over Midwest which it
> does not have.  Simply put, the law does not
> authorize a manufacturer like ICI to refuse
> to sell its product to a painting contractor.

ICI further contends that cases which have imposed a duty to

warn the ultimate consumer typically involve tangible items that

could bear a warning the ultimate consumer could read and heed.

*See Groll, supra,* 148 Cal.App.3d at 449.  Here, ICI argues:

> The ultimate consumer who, like here, hires
> an experienced painting contractor, will not
> see the paint can and is in no position to
> read any warnings.  This consideration
> applies even more forcefully in this case
> where the alleged 'advice' appears to have
> been an oral statement made directly to
> Midwest and not an alleged deficiency in
> written warning language on the paint can.

17

1    Whether or not a legal duty running from ICI to Penny Newman

2  existed may well depend upon the actual facts as established at

3  summary judgment or trial.  Penny Newman alleges that ICI did

4  warn Midwest that the Devoe products were unsuitable for the

5  Stockton Facility but nonetheless sold those products to Midwest

6  without taking any additional action.  However, Midwest alleges

7  that ICI, through its authorized retailer, Norberg, did not

8  advise or warn Midwest that the Devoe products were unsuitable

9  for the Stockton Facility.  Until this factual dispute is

10  resolved, the existence of a legal duty running from ICI to Penny

11  Newman to warn Penny Newman or to desist from the sale of the

12  Devoe products to Midwest cannot be determined.  Even if ICI

13  advised Midwest that the Devoe products were not suitable to the

14  Stockton Facility, Midwest, in the exercise of its professional

15  judgment and experience, could have disagreed.  Does a legal duty

16  of care run from ICI to Penny Newman under that circumstance?

17  How specific does the advice have to be before such a duty

18  arises?  Does imposition of a legal duty essentially make ICI the

19  insurer of the performance of the contract between Penny Newman

20  and Midwest?  If such a legal duty is determined to exist, the

21  scope of that duty is problematic and may well depend upon the

22  actual underlying facts.  Arguably, imposition of a duty on ICI

23  to warn Penny Newman could result in potential liability to ICI

24  for, as an example, interference with the contract between Penny

25  Newman and Midwest.  In addition, whether or not ICI had any

26  legal duty to Penny Newman to refrain from selling the Devoe

18

1   products to Midwest may well depend upon the actual facts.

2   Therefore, although ICI's arguments raise serious reservations

3   about the imposition of a duty of care running from ICI to

4   Midwest, it cannot be concluded at the pleading stage that such a

5   duty of care does or does not exist as a matter of law.

6        D.   **Economic Loss Rule**.

7        As noted, the FAC prays for "the costs of hiring experts to

8   investigate and analyze the damages in an amount according to

9   proof at the time of trial" and "the costs of restoration and

10  repair to the Stockton Facility according to proof at the time of

11  trial".

12       ICI moves for dismissal of the Fourth Cause of Action on the

13  ground that California's "economic loss rule" bars this claim.

14       In *Seely v. White Motor Co.*, 63 Cal.2d 9, 18 (1965), the

15  California Supreme Court held that the plaintiff could not

16  recover in strict liability or negligence for the cost of

17  repairing the defective truck or for business income lost because

18  the truck could not make deliveries.  "Even in actions for

19  negligence, a manufacturer's liability is limited to damages for

20  physical injuries and there is no recovery for economic loss

21  alone."  *Id*.  "'"Economic" loss or harm has been defined as

22  "damages for inadequate value, costs of repair and replacement of

23  the defective product or consequent loss of profits - without any

24  claim of personal injury or damages to other property ...."'"

25  *Sacramento Regional Transit Dist. v. Grumman Flxible*, 158

26

19

1  Cal.App.3d 289, 294 (1984).[1]

2      Penny Newman argues that, under the circumstances presented

3  by this case, California law allows the recovery of economic

4  damages under negligence.

5      In *Biakanja v. Irving*, *supra*, 49 Cal.2d 647, the California

6  Supreme Court held that a defendant's negligent performance of a

7  contractual obligation resulting in damage to the property or

8  economic interests of a person not in privity could support

9  recovery if the defendant was under a duty to protect those

10  interests.  The factors looked to in determining the existence of

11  such a duty are identical to those set forth above, i.e., (1) the

12  extent to which the transaction was intended to affect the

13  plaintiff, (2) the foreseeability of the injury suffered, (3) the

14  degree of certainty the plaintiff was injured, (4) the connection

15  between the defendant's conduct and the injury, (5) the moral

16  blame attached to the conduct, and (6) the policy of preventing

17  future harm.  In *Biakanja*, the Supreme Court concluded that the

18  defendant notary owed a duty to an intended beneficiary not to

19  mishandle the will's drafting and solemnization, attaching

20  _____

21      [1]Penny Newman asserts that the damages sought by the FAC are
    not solely "economic damages", because the FAC alleges that the
22  Stockton Facility has been exposed to the elements and will have to
    be stripped of the Devoe products resulting in additional costs and
23  wear and tear on the Stockton Facility.  Although ICI replies that
    wear and tear to the Stockton Facility is not alleged in the FAC
24  and that, even if it were, "that allegation would fail for wont
    [sic] of any meaningful specificity or alleged causal relationship
25  to the alleged paint failure", resolution of this issue is not
    necessary at this juncture given denial of this aspect of the
26  motion to dismiss.

1   particular importance to the fact that the end and aim of the

2   notary's services to the testator was to provide for the passing

3   of the estate to the plaintiff and to the high impropriety and

4   need to prevent the unlicensed practice of law.  *Aas v. Superior*

5   *Court*, 24 Cal.4th 627, 644 (2000).

6       In *J'Aire Corporation v. Gregory*, 24 Cal.3d 799 (1979), the

7   Supreme Court applied the *Biakanja* factors to conclude that the

8   tenant of a building used as a restaurant could state a cause of

9   action for negligence against a renovation contractor hired by

10  the building's owner for business income lost when the contractor

11  failed to complete the project with due diligence.  Applying the

12  *Biakanja* factors, the Supreme Court held that a "special

13  relationship" permitting recovery of economic losses existed

14  between the contractor and the tenant.  The Supreme Court held

15  that the *Biakanja* factors, in combination with "ordinary

16  principles of tort law such as proximate cause", were "fully

17  adequate to limit recovery" of purely economic damages "without

18  the drastic consequence of an absolute rule which bars recovery

19  in all such cases."  *Id.*, 24 Cal.3d at 808.  In *Platte Anchor*

20  *Bolt, Inc. v. IHI, Inc.,* 352 F.Supp.2d 1048, 1052-1053

21  (N.D.Cal.2004), the District Court explained:

22          Despite the general rule regarding economic
            loss, California law recognizes a limited
23          exception.  The California Supreme Court has
            'held that a defendant's negligent
24          performance of a contractual obligation
            resulting in damage to the property or
25          economic interests of a person not in privity
            [can] support recovery if the defendant was
26          under a duty to protect those interests.' ...

                                21

This exception was first articulated in
*Biakanja*, a case in which the state supreme
court held that a notary public was under a
duty to exercise due care to protect a will's
devisee, despite the absence of privity
between the notary public and the devisee ...
The exception was further clarified in *J'Aire
Corp. v. Gregory* ..., which articulated a
six-factor test to determine whether such an
extra-contractual duty exists.  When the
*J'Aire* test is met, the defendant is deemed
to have a 'special relationship' with the
plaintiff and may be liable to the plaintiff
in negligence for economic damages ....

Penny Newman contends that the same factors that establish a
duty of care on the part of ICI, *see discussion supra*, also
support a finding that a "special relationship" exists which
gives Penny Newman the right to recover economic damages:

[A]s alleged in the [FAC], [ICI] knew the use
to which its paint products was to be made,
knew that its customer, MIDWEST, was aware of
the unsuitability of the paint products it
was purchasing for the intended application,
and knew that its customer despite having
been warned of the unsuitability intended to
proceed with the painting of PENNY NEWMAN's
facility with the unsuitable [ICI] paint
products.  Nevertheless, [ICI] proceeded to
supply MIDWEST with inappropriate paint
products, and made no effort to provide PENNY
NEWMAN with an opportunity to protect itself.
Under such circumstances, a 'special
relationship' exists sufficient to justify an
award of economic damages as a result of
[ICI's] negligence.

ICI replies that existence of a "special relationship"
between Penny Newman and ICI need not be reached because "the
condition precedent to the application of this exception - i.e.
that ICI tortuously breached a contract with Midwest - is
entirely absent in this case."  Relying on the allegations of

22

1  Midwest's Third Party Complaint against Norberg, ICI contends

2  that it is not in contractual privity with Midwest and,

3  therefore, could not have tortuously breached a contract with

4  Midwest.

5      ICI cites no authority specifically requiring a contractual

6  relationship between parties such as ICI and Midwest as a

7  prerequisite to the recovery of economic loss damages by a party

8  such as Penny Newman and no such authority has been discovered.

9  Given the absence of this authority and the legal standards

10 governing resolution of a motion to dismiss under Rule 12(b)(6),

11 dismissal on this ground as a matter of law is not appropriate.

12      **E.   Conclusion**.

13      For the reasons set forth above, Defendant The Glidden

14 Company dba ICI Paint's motion to dismiss the Fourth Cause of

15 Action is DENIED at the pleading stage.

16 IT IS SO ORDERED.

17 **Dated:    November 8, 2006**            _____/s/ Oliver W. Wanger_____
   668554                                UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

23